[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
The plaintiff wife, 44, and the defendant husband, 52, intermarried at New Delhi, India on October 2, 1970. Two children were born to the parties, both of whom are now adults. The court has jurisdiction based on the plaintiff's continuous residence in this state for more than a year prior to April 22, 1992, the date of the plaintiff's complaint. Both parties enjoy good health. CT Page 9080
 II.
Both parties were born in India to families that were Hindu in culture and in their religious belief. The defendant, who had been residing in the U.S.A., returned to India to seek a bride. The parties' introduction to one another was chaperoned. After three meetings the parties were married in a Hindu ceremony. Three days after the wedding, the defendant returned to the U.S.A. Although an arranged marriage it was typical of Hindu custom. The plaintiff arrived in the U.S.A. on October 28, 1970 as the Indian Hindu bride that the defendant had sought to be his wife.
 III.
The defendant received a B.S. in Chemistry from Delhi U. in 1962, a B.S. in engineering from Indian Institute of Science in 1965; an M.S. in engineering from Columbia U. in 1969; and an M.B.A. from R.P.I. in 1974. From August, 1969 until November, 1977 the defendant was employed by General Electric in Schenectady, N.Y.
 IV.
The parties first home was on Division Street in Schnectady, acquired on August 1, 1972, (plaintiff's Exhibit P). Their second house was located on Ghents Road, also in Schnectady, acquired on June 17, 1974. (Plaintiff's Exhibit O). The plaintiff took issue with the addition of Dinesh Nangia to the title to both, homes but the court finds it irrelevant, neither property having been retained.
 V.
Beginning in May, 1975 the plaintiff began attending bible study meetings at a neighbor's home on a weekly basis which continued until September, 1976, all without the defendant's knowledge. During this time the plaintiff was also taken to the neighbor's church. During this same period the plaintiff stopped socializing with any Indian friends, leaving the defendant to attempt [attend] such gatherings without her. The plaintiff places her conversion to Christianity as occurring in April, 1975. CT Page 9081
 VI.
During this same time the defendant's parents arrived for a three month visit that ended on March 7, 1975. The defendant testified that Hindu custom is to allow the elders respect during their visit. The plaintiff characterized her mother-in-law's behavior as an attempt to take over the running of the household. The plaintiff asked her in-laws to leave when the plaintiff understood their stay was to be extended. The defendant viewed such request as an insult.
 VII.
In 1976 the defendant was hospitalized. The plaintiff testified that she visited the defendant daily, and on their anniversary sent flowers which the defendant returned in a crushed condition. The plaintiff denied that the card contained a Christian message. When the plaintiff prayed, the defendant objected for the prayer was Christian. The defendant requested a Hindu prayer, according to the plaintiff. The plaintiff admitted that her conversion was upsetting to the defendant.
 VIII.
The plaintiff then arranged for the baptism by immersion, in a friend's outdoor pool, of the parties' two children, again without the defendant's knowledge or permission. When he discovered the baptism, the defendant viewed it a deprivation of his rights as the father.
 IX.
The plaintiff's first visit to India occurred in December, 1972. Her next visit began in October, 1976 when she and the two children left for India, staying for six months. Thereafter the defendant travelled to India in the hope that he could persuade the plaintiff to readopt the Hindu religion. He attempted to enlist the aid of the plaintiff's family. His efforts failed. The plaintiff refused his request. After returning to New York the plaintiff called a lawyer, started to pack and planned to divorce the defendant.
During 1977 a friend of defendant's, Visho, became a frequent visitor and the defendant came to believe he was showing untoward attention to his wife who was encouraging it. CT Page 9082 Accusations were made and denied.
The parties slept in separate rooms for a two year period before reconciling.
The defendant agreed to see a Christian counsellor and the parties remained together. By now the plaintiff was attempting to convert the defendant to her religion.
 X.
In October, 1977 the defendant received a leave of absence from G.E. in order to undertake a two year research project for the U.S. Government, which required him to move to Washington, D.C. In December the plaintiff followed. The family lived in Watersberg, Maryland where the plaintiff was active in church events several days each week and on Sundays, bringing the older child with her during her church work. Since the parties now owned two cars, the plaintiff's activities were no longer hampered by lack of transportation or by dependence on neighbors or friends.
 XI.
The defendant returned to G.E. at Cincinnati, Ohio in November, 1979 where the family remained until the defendant accepted his present position. The parties purchased a house known as 10678 Indianwoods Dr., Cincinnati, Ohio. This real estate parcel is still owned by the defendant who has a lease arrangement with The Proctor Gamble Company for a monthly rent of $1,250 (Defendant's Exhibits #7 and #8). The property is in need of repair (Defendant's Exhibit #5). The defendant values the property at $142,000 subject to two mortgages totaling $124,482. The defendant estimated the repair costs to be about $5,000.
 XII.
The plaintiff increased her activities with her church. Between 1982 and 1990 she made three trips to various parts of India to preach. The parties daughter was along on all the trips and their son made one trip. The plaintiff also engaged in overnight religious retreats while the children remained at home with the defendant. CT Page 9083
 XIII.
The defendant's 24 year old niece arrived from India in 1985 and stayed for 2-1/2 years while she attended school. The plaintiff also returned to school attending the University of Cincinnati for six courses for her master's degree. The defendant paid the tuition. In addition, the plaintiff started studying for the ministry with the Assemblies of God Church.
 XIV.
After 17 years of employment with G.E. in engineering and marketing, the defendant accepted employment commencing October 10, 1988 with Textron Lycoming, Stratford, Connecticut as manager of materials laboratory where the plaintiff has remained until the present time. Currently, the defendant earns $2,006 weekly gross and $1,190.55 net, including a deduction of $150.37 for social security and medicare. The court notes that, upon reaching $60,000, the deduction for medicare only (1.45%) continues to year end.
 XV.
The parties have stipulated that the present value of defendant's G.E. pension is $68,220.93 and his Textron Lycoming pension present value is $29,609.77 (cf. Stip. dated March 2, 1994 on file).
 XVI.
In addition to his salary the defendant receives the rent from the Cincinnati house from which he must pay the mortgages, taxes, insurances and upkeep, along with depreciation claimed which actually shelters his other income. The cash flow does not cover the other expenses.
The parties have agreed that the plaintiff shall assign all her interests in the Ohio property to the defendant who shall be solely responsible for the liability and expense of same. The plaintiff does not abandon any claim to the equity, particularly disclaiming any benefit received from the second mortgage held by defendant's relatives.
XVII. CT Page 9084
After living in rental homes initially after arriving in Connecticut, the parties contracted to purchase 65 Shane Drive, Southbury. Suffice to say that the title was not delivered to the Nangias, litigation ensued and the Derby Savings Bank foreclosed and obtained title (Plaintiff's Exhibit Y). The parties' stipulation of May 18, 1994 assigns all the plaintiff's interest in the premises to the defendant to enable the defendant to reacquire title. On July 15, 1994 the defendant successfully completed the purchase of the premises.
The defendant mortgaged the premises for $300,000 which is approximately the present fair market value. The credit standing or credit rating of each party has been salvaged but the court finds that the entire transaction did not generate any profit (Court's Exhibits I, II, and III).
 XVIII.
An observation by the court is necessary. Fault was featured with a great deal of time and testimony spent on the element.
The plaintiff's testimony on this issue begins with a description of a dispute between the parties on the first day the plaintiff spent in the U.S.A. She then proceeded to paint a picture of a wife bereft of family, friend and finances. The defendant gave her the household checkbook which he took back after two months. A friend, Carole, taught her to drive. The plaintiff had many complaints regarding the defendant's behavior toward her during their years in Schenectady.
The underlying cause of the ongoing marital rift was the plaintiff's repudiation of her Hindu tradition, her adoption of "Western" ways, her shunning of other Indians and her conversion to Christianity. The friction was greatly exacerbated by the plaintiff's unilateral decision to baptize the children.
 XIX.
The defendant's witness, Nancy Muccio, who knew the parties in 1987, described a meeting with the plaintiff and the parties' son to resolve a family crisis attributed to the constant clash of Hindu and Christian beliefs of the parents. As a lay counsellor, Mrs. Muccio encouraged the parties to compromise. A marriage agreement was drawn up, (Defendant's Exhibit #1). CT Page 9085 Throughout this reconciliation effort no claim of physical abuse was made by the plaintiff. The witness described the plaintiff as well dressed and very active with her church activities. The sessions stopped after Mrs. Muccio concluded that the plaintiff was not willing to reconcile the parties' differences but was more concerned with her reputation in her church. The court found Mrs. Muccio to be a credible witness.
 XX.
Another witness called by the defendant, Mrs. Philice Louise Shippy, also of Cincinnati, Ohio, a pastor of Urban Missions Church, met the defendant in 1983 at a prayer meeting. The association subsequently became a social one as well. The defendant told the witness that the marriage was an unhappy one due to the differences in religious beliefs. The witness became acquainted with the defendant in 1987 when the family crisis intervention group convened to deal with the parties' son's needs.
The plaintiff complained about many things but never about any physical abuse. The witness found the defendant's conduct at odds with the plaintiff's prior descriptions. The witness observed that the plaintiff preferred "Western" culture and preferred not being married to a Hindu. The court finds defendant was cold, rigid and penurious but not physically abusive.
 XXI.
After moving to Connecticut, the plaintiff continued her church activities, joining the Cornerstone Assembly of God Church in Southbury, and obtained a Master's in counselling from Liberty U. of Virginia in May, 1992 by correspondence. This enabled her to conduct her own counselling business which was generating $571.47 weekly gross in August, 1992 as on the plaintiff's financial affidavit.
 XXII.
The plaintiff held a license to preach in 1991 (Plaintiff's Exhibit G) which expired January 31, 1992. She was listed on p. 324 of the September 25, 1992 edition of the "Official List of the Ministries and Missionaries of the General Council of the Assemblies of God" (Plaintiff's Exhibit T). CT Page 9086
 XXIII.
Finally, in preparing for a choir recital in December 1991, the plaintiff found another man more to her liking. This relationship has now ripened into an engagement.
 XXIV.
The plaintiff called Evan Stark, Ph.D. in Sociology, as an expert, witness. Relying entirely upon the plaintiff's version of the marriage, which he obtained during two interviews at his office at New Haven during September, 1993, he concluded that she was a "battered woman".
The empirical evidence produced during the trial does not corroborate the plaintiff's description of her marriage. The court rejects the opinion, since it is not based on reliable data.
 XXV.
The court concludes that the primary cause of the breakdown was the friction created by the plaintiff's conversion to Christianity. The court declines to assess fault, for religious belief is personal and the right to exercise it is protected.
 XXVI.
Having reviewed the evidence in light of the statutory criteria, the court enters the following decree.
1. Judgment is entered on the complaint dissolving the parties' marriage on the ground of irretrievable breakdown.
2. The defendant shall retain the real estate known as 65 Shane Drive, Southbury, Connecticut as his sole property and be solely responsible for same.
3. The defendant shall retain the real estate known as 10678 Indianwoods Drive, Cincinnati, Ohio as his sole property and he solely responsible therefor.
4. The G.E. pension is to be divided equally between the parties and a proper qualified order shall be prepared by the CT Page 9087 plaintiff's counsel for signature.
5. The G.E. savings plan distribution now held by the defendant in an IRA forum is ordered divided by setting over to the plaintiff the sum of $70,000 in stock or cash and a QDR order shall be prepared by the plaintiff's attorney for signature.
6. The Textron Lycoming savings plan shall be divided by setting over to the plaintiff the sum of $1,500 cash and 300 shares of Textron stock and a QDR order shall be prepared by the plaintiff's attorney for signature.
7. The IDS IRA of the defendant shall be divided by setting over to the plaintiff the sum of $8,000 and a QDR order shall be prepared by the plaintiff's attorney.
8. The plaintiff's IDS IRA shall be retained by her as her sole property.
9. Each party shall be the sole owner of all items of tangible and intangible personal property as each now possesses same. This order encompasses autos, jewelry, household furniture and furnishings and banking.
10. Each party shall be solely responsible for the bills each has listed on the respective financial affidavits.
11. Lump sum alimony of $20,000 is ordered paid to the plaintiff by the defendant at the rate of $300 weekly commencing on the Friday after this judgment is entered. A wage withholding order is entered.
12. An allowance to prosecute is awarded to the plaintiff to defray her litigation expenses of $10,000. The defendant shall deliver a cashier's check payable to both the plaintiff and Attorney Michael K. Conway in said amount within 60 days of entry of judgment.
13. Periodic alimony is awarded to the plaintiff of $500 weekly to be paid by the defendant for a period of five years, to allow the plaintiff to again establish her counselling practice. The term is non-modifiable, to sooner terminate upon the plaintiff's remarriage, or the death of either party.[1]
CT Page 9088
14. The stipulation dated May 18, 1994 (#155) and the court order thereon dated June 28, 1994 both survive and are incorporated herein by reference.
Plaintiff's counsel is ordered to submit a judgment file for the undersigned's signature.
HARRIGAN, J.